**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

NIKKI LOUISE ALEXANDER,      )
                                 )
              Plaintiff,      )
                                 )     No. 2:20-cv-03389-DCN
            vs.           )
                                 )     **ORDER**
PHARMERICA LOGISTIC SERVICES, LLC  )
d/b/a PharMerica,              )
                                 )
             Defendant.     )
_____)

This matter is before the court on defendant Pharmerica Logistic Services, LLC d/b/a PharMerica's ("PharMerica") motion for summary judgment, ECF No. 42. For the reasons set forth below, the court grants the motion in its entirety.

## I.  BACKGROUND

This dispute arises from PharMerica's termination of plaintiff Nikki Louise Alexander ("Alexander") from her position as pharmacy director at PharMerica's Charleston, South Carolina location. PharMerica is a long-term care pharmacy that provides pharmacy services for skilled nursing, assisted living, and group homes. PharMerica hired Alexander as a pharmacy director on September 29, 2017. As the pharmacy director of the Charleston location, Alexander served as the onsite supervisor of the pharmacy and was responsible for overseeing its operations. This meant ensuring that the company was meeting its benchmarks and complying with state and federal regulations.

According to PharMerica, Alexander's job performance continually failed to meet the pharmacy's expectations, despite multiple coaching sessions and discussions about

performance metrics.  Notably, in October 2018, Alexander was placed on PharMerica's Performance Improvement Plan ("PIP").  The PIP included a coaching session with Sarah Leonard ("Leonard"), the regional pharmacy director and Alexander's supervisor, in which Leonard provided six areas where Alexander needed to improve.  On December 3, 2018, Leonard met again with Alexander.  Leonard acknowledged at the meeting that Alexander had improved in "some very low hanging fruit" areas but mentioned that continued improvement in other areas was expected.  ECF No. 42-4, Leonard Dep. at 49:18–19.  Leonard followed this conversation up with an email memorializing the discussion.  ECF No. 42-6.  Alexander's performance purportedly continued to lag over the remainder of her employment, as reflected in Alexander's performance reviews.  See ECF No. 42-7 at 5.

In August 2019, Leonard asked the pharmacy director from PharMerica's Knoxville, Tennessee location, Shannon Toland ("Toland"), to visit the Charleston location and assist Alexander.  According to Alexander, Leonard made multiple false and defamatory statements to Toland about Alexander's job performance around that time, including statements that Alexander was an incompetent pharmacist and pharmacy director.  Leonard allegedly made similar statements at other points in time to several employees at the Franke at Seaside continuing care retirement community, to a delivery manager at a partner company, to individuals affiliated with the Conway Manor long-term care facility, and to a hurricane information center employee.

On August 27, 2019, Alexander and Toland were working late to conduct an inventory count in advance of the impending Hurricane Dorian.  Late that evening, Alexander stepped onto a stepstool which slipped out from under her.  At 11:31 PM,

2

Alexander emailed Leonard, writing: "I stepped onto a step stool which slipped from under me.  I didn't fall but I think I may have strained my back."  ECF No. 43-2 at 11.  The following morning, Alexander called her doctor, who advised her to rest and apply ice and heat.  Alexander decided to go into work the next day but left early to rest.  ECF No. 43-4, Alexander Dep. at 46:4–7.

Hurricane Dorian arrived at the beginning of September.  According to PharMerica, Alexander was charged with operating the Charleston pharmacy during that time, which required her to stay in close contact with Leonard regarding the immediate needs of her pharmacy and its customers.  PharMerica claims that Alexander failed in multiple respects to execute those duties during that time of need.  On September 5, 2019, Leonard tried to reach Alexander's cell phone because the phone line to reach the Charleston pharmacy was down, but Leonard was unable to do so for an extended period.  On another occasion, Alexander supposedly failed to inform Leonard that she had received a call advising her that the power had gone out at the pharmacy and then failed to send security guards to the site, as required by pharmacy regulations.  Alexander also supposedly provided incorrect information to employees during the hurricane.  For example, Alexander sent an email to pharmacy personnel stating that police were stationed on a bridge leading to the pharmacy and were not allowing anyone to cross in either direction.  Leonard called the Hurricane Information Center and determined that Alexander's email was wrong and had to be corrected.  Finally, PharMerica claims that Leonard failed to safely secure the refrigerated medicines at the pharmacy before the hurricane hit, costing the pharmacy over $16,000 in lost medicines.

3

Alexander, for her part, states that she worked diligently and extensively on September 2, 2019—the last day the pharmacy was open—in preparation for Hurricane Dorian's impact on the pharmacy. She further explains that she worked from home on September 3, 4, and 5, despite being in pain from the fall. She arrived back to work at the pharmacy on the morning of September 6, 2019, and the pharmacy was back to fulfilling prescriptions at around 10:30am. On that same day, September 6, 2019, PharMerica terminated Alexander's employment after Leonard arrived to notify her in person. PharMerica subsequently prepared a performance improvement form memorializing the decision as a "corrective action" and listed the reasons for her termination. ECF No. 42-15. On December 18, 2019, Alexander submitted a workers' compensation claim to the South Carolina Workers' Compensation Commission. ECF No. 42-12. Alexander also filed claims with the Equal Employment Opportunity Commission and Occupational Health and Safety Administration.

On August 21, 2020, Alexander filed a complaint against PharMerica in the Charleston County Court of Common Pleas. ECF No. 1-1, Compl. On September 24, 2020, PharMerica removed the action to this court. ECF No. 1. On February 3, 2021, Alexander filed an amended complaint, now the operative complaint, alleging (1) workers' compensation retaliation, (2) defamation, and (3) violation of the Americans with Disabilities Act ("ADA"). ECF No. 21, Amend. Compl.

On June 15, 2022, PharMerica filed its motion for summary judgment. ECF No. 42. Alexander responded to the motion on June 29, 2022, ECF No. 43, and PharMerica replied on July 13, 2022, ECF No. 46. The court held a hearing on the motion on

September 7, 2022. ECF No. 48. As such, the motion has been fully briefed and is now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

## III.  DISCUSSION

PharMerica moves for summary judgment in its favor on each of Alexander's three causes of action. The court addresses each cause of action in turn, ultimately finding that summary judgment is warranted in PharMerica's favor on all claims.

### A. Workers' Compensation Retaliation

First, PharMerica argues that Alexander is unable to establish the necessary

elements of a workers' compensation retaliation claim. In the amended complaint,

Alexander alleges a claim for workers' compensation retaliation under S.C. Code Ann.

§ 41-1-80. Specifically, she alleges:

> [Alexander] instituted a good faith report of her workplace injury to her supervisor [Leonard], a protected activity under the South Carolina Workers' Compensation Law . . . . [Alexander] did not file her claim with the South Carolina Workers' Compensation Commission until a later date after her termination, but [PharMerica] was on sufficient notice of [Alexander] instituting a workers' compensation proceeding by [her] written notice of injury to Leonard on August 27, 2019 and [her] conversations with Leonard about [Alexander] seeking medical care from Pullano Family Medicine and ongoing pain from the workplace injury between the date of injury on August 27, 2019 and termination on September 6, 2019.

Amend. Compl. ¶ 44.

In South Carolina, "[n]o employer may discharge or demote any employee

because the employee has instituted or caused to be instituted, in good faith, any

proceeding under the South Carolina Workers' Compensation Law." S.C. Code § 41-1-

80. "In order to prove a claim under § 41-1-80, a plaintiff must establish three elements:

1) institution of workers' compensation proceedings, 2) discharge or demotion, and 3) a

causal connection between the first two elements." Hinton v. Designer Ensembles, Inc.,

540 S.E.2d 94, 97 (S.C. 2000) (citing Hines v. United Parcel Serv., Inc., 736 F. Supp. 675

(D.S.C. 1990)). The burden of proof is on the employee to prove each element. S.C.

Code Ann. § 41-1-80.

PharMerica previously moved to dismiss Alexander's first cause of action in the

original complaint on the grounds that Alexander had failed to plead the first element of

the claim. ECF No. 7. Specifically, PharMerica argued that since Alexander did not file

6

her workers' compensation claim until after she had been terminated, PharMerica could not have discharged her on the grounds that a workers' compensation proceeding had been instituted.  In its order (the "Motion to Dismiss Order"), the court partially diverged from defendants' reasoning, noting that § 41-1-80 does not "require a formal filing of a Workers' Compensation Claim by the employee" prior to the discharge or demotion because the statute was not intended to "be avoided by firing an injured employee before he or she files a claim."  ECF No. 20 (quoting Johnson v. J.P. Stevens & Co., Inc., 417 S.E.2d 527, 529 (S.C. 1992)).  Nevertheless, the court explained that to satisfy the first element in the absence of a claim filed prior to the adverse action, a plaintiff must show that there were "circumstances which would lead the employer to infer that a workers' compensation claim is likely to be filed."  Id. (quoting Atkinson v. House of Raeford Farms, Inc., 874 F. Supp. 2d 456, 475 (D.S.C. 2012)).  Such circumstances may include where the employer has agreed to pay for medical care or where the employer has received "written notice from an independent health care provider in the form of a bill for medical services rendered to an injured employee."  Johnson, 417 S.E.2d at 529.  However, those actions do not "make up an exhaustive list of conduct sufficient to be considered as instituting a workers' compensation claim" and "[e]ach case must be analyzed individually."  Atkinson, 874 F. Supp. 2d at 475.

In the Motion to Dismiss Order, the court determined that "Alexander fail[ed] to state a claim with respect to the first element of workers' compensation retaliation" because it was clear, from the face of the complaint, that Alexander did not file her claim prior to her termination.  ECF No. 20 at 5.  Based on the caselaw above, the court further noted that "Alexander d[id] not allege that she received medical care for her injury prior

to termination" or allege that she "communicat[ed] with PharMerica regarding her injury prior to her termination." Id. Nevertheless, the court granted Alexander leave to amend her complaint, pursuant to her request, to allege additional facts related to PharMerica's notice of her impending workers' compensation claim. Alexander subsequently amended her cause of action to include the allegation that Alexander emailed Leonard about her injury on August 27, 2019, and that Alexander conversed with Leonard about receiving medical care. Amend. Compl. ¶ 44.

Despite Alexander's amendment, the parties have returned to square one, albeit now with the benefit of discovery. PharMerica argues, again, that Alexander did not file a workers' compensation claim prior to her termination and, notably, did not provide notice such that PharMerica could infer that one was "likely be filed." Atkinson, 874 F. Supp. 2d at 475. The court agrees. At bottom, Alexander relies on an email and a supposed conversation between her and Leonard regarding the injury. But the email suggests that if anything, Alexander downplayed the injury to Leonard. In the immediate aftermath of the accident, Alexander wrote to Leonard:

> While counting one of the last drugs I stepped onto a step stool which slipped from under me. I didn't fall but I think I may have strained my back. I'm going to take Motrin and put some ice on it. If it still hurts in the morning I will let you know and go to the doctor.

ECF No. 43-2 at 11. Leonard responded, "Ok feel better and give me a call either way. Glad you didn't fall." Id. Alexander's statement could not have reasonably put Leonard—and PharMerica, by extension—on notice that Alexander would thereafter file a workers' compensation claim. Alexander also testified that she had a conversation with Leonard on the next day where she told Leonard: "I had contacted my physician. My physician told me to do ice and moist heat." ECF No. 42-2, Alexander Dep. at 37:14–16.

8

Leonard, on the other hand, repeatedly disputes ever hearing that Alexander contacted a physician. See, e.g., Leonard Dep. at 84:15–18 ("Q: Do you recall Nikki Alexander telling you that she had a phone doctor's appointment with her physician? A: She did not."). This amounts to a factual dispute over the content of the conversation, but the court need not resolve it because the conversation, even by Alexander's account, does not rise to the level of constituting notice of a future workers' compensation claim. As defendants observe, a conversation about a phone call with a physician is not tantamount to the payment of medical bills or notice about medical services rendered; otherwise, companies would be required to anticipate workers' compensation claims for every visit to the doctor. Similarly, although Alexander provides documentation that she did, in fact, have a remote consultation with Dr. Jennifer Pullano on August 28, 2019, ECF No. 43-5 at 9, the relevance lies in how that visit was communicated to PharMerica. Even in the light most favorable to Alexander, her discussion with Leonard, assuming it occurred, would not put PharMerica on notice that a workers' compensation claim would be filed.

Finally, Alexander argues that she could not have been expected to initiate a workers' compensation claim while she was employed because that was Leonard's obligation under PharMerica's employee handbook. The "Workers' Compensation Insurance" section of the handbook provides that if an employee becomes injured or ill through work, the employee should "immediately inform [his or her] manager/supervisor regardless of how minor the injury or illness might be." ECF No. 43-2 at 12. The handbook then states that it is the "manager's responsibility to ensure a claim is submitted through the Company's workers compensation carrier." Id. at 13.

PharMerica's employee handbook, however, does not override the law. As the court explained in its Motion to Dismiss Order, courts analyzing South Carolina law have clearly stated that if the workers compensation proceeding was not instituted during the term of employment, there must be conduct "sufficient to be considered instituting a proceeding." Atkinson, 874 F. Supp. at 475. While the South Carolina Supreme Court has cautioned that there is no exclusive list of qualifying conduct, finding that notice can be based on the disclosure of any injury, no matter how "minor," does not meet the standard as a matter of law. See Barton v. House of Raeford Farms, Inc., 745 F.3d 95, 110 (4th Cir. 2014) (reversing the district court's ruling where the district court "failed to follow the jurisprudence of the South Carolina Supreme Court" and found in favor of workers' compensation retaliation despite the lack of evidence "(1) that [the employer] agreed to pay for the plaintiffs' medical care or (2) that [the employer] received a bill for the plaintiffs' care from an independent health care provider.") (emphases omitted). In other words, proving that a conversation took place between Alexander and Leonard in accordance with the handbook is not an adequate substitute for the statutory requirement to prove that PharMerica was on notice that a workers' compensation claim was likely to be filed. As such, the court grants summary judgment in PharMerica's favor on the workers' compensation retaliation claim.

## B.  Defamation

Next, PharMerica argues that summary judgment is warranted in its favor on Alexander's defamation claim. In the amended complaint, Alexander alleges that Leonard made false and defamatory statements to the following individuals: (1) Toland; (2) individuals at Franke at Seaside, a continuing care retirement community and

PharMerica's customer; (3) Alex Jackson, a delivery manager at Diligent Delivery Systems; (4) individuals at Conway Manor, a long-term care facility and PharMerica's customer; and (5) Susan Griffith, an employee at the Hurricane Information Center. Amend Compl. ¶¶ 37–41.

In South Carolina, defamation claims can be brought for either libel or slander. Parrish v. Allison, 656 S.E.2d 382, 388 (S.C. Ct. App. 2007). "Libel is the publication of defamatory material by written or printed words," while slander is "spoken defamation." Id. To bring a successful claim for defamation, a plaintiff must prove: "(1) a false and defamatory statement was made; (2) the unprivileged publication of the statement was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement regardless of special harm or the publication of the statement caused special harm." Kunst v. Loree, 817 S.E.2d 295, 302 (S.C. Ct. App. 2018), reh'g denied (Aug. 16, 2018). The court considers the first two elements of defamation below, finding that Alexander has failed to present a genuine dispute of material fact under either factor.

### a. False and Defamatory Statement

"Under common law, a defamatory communication was presumed to be false, but truth could be asserted as an affirmative defense." Parrish v. Allison, 656 S.E.2d 382, 391 (S.C. Ct. App. 2007) (citing Beckham v. Sun News, 344 S.E.2d 603, 604 (S.C. 1986)). If there is a dispute regarding the truth of the defamatory statement, it is a question for the jury to determine. Weir v. Citicorp Nat'l Servs., Inc., 435 S.E.2d 864, 867 (S.C. 1993). "The publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Fleming v. Rose, 567 S.E.2d 857, 860

(S.C. 2002). "It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." Lane v. Hilton Worldwide, Inc., 2012 WL 1191648, at *3 (D.S.C. Feb. 28, 2012), report and recommendation adopted, 2012 WL 1192065 (D.S.C. Apr. 10, 2012) (internal quotation marks and citation omitted). "The Court will not hunt for a forced and strained construction to put on ordinary words, but will construe them fairly, according to their natural and reasonable import, in the plain and popular sense in which the average reader naturally understands them." Timmons v. News & Press, Inc., 103 S.E.2d 277, 280–81 (S.C. 1958). In other words, there is a presumption of falsity but "no presumption of defamation." Id. at 281.

The amended complaint does not specify whether the allegedly defamatory statements were written or spoken. In fact, the amended complaint does not specify the precise content of any statements at all. Instead, Alexander generally alleges that Leonard "made multiple false statements, including but not limited to" statements that Alexander "was an incompetent pharmacist," "failed to monitor the needs of the pharmacy," "failed to communicate effectively in the context of her profession," "needed constant supervision," among others. E.g., Amend. Compl ¶ 37. While it may have sufficed for Alexander to reference the general contours of the allegedly defamatory statements in her complaint, Alexander mostly continues to make sweeping assertions about the supposed statements made by Leonard. See, e.g., ECF No. 43 at 31 ("Leonard made multiple false statements to Toland, including but not limited to Plaintiff was an incompetent Pharmacy Director, Plaintiff was an incompetent pharmacist, Plaintiff failed to monitor the needs of the pharmacy, Plaintiff failed to communicate effectively in the context of her profession, Plaintiff needed constant supervision, or she could not do her

job . . . .").  "Without [the plaintiff] identifying the specific statements or statements on which [s]he bases h[er] claim, we cannot evaluate whether there existed a genuine issue of material fact as to the truth or defamatory nature of the statements."  Harris v. Tietex Int'l Ltd., 790 S.E.2d 411, 416 (S.C. Ct. App. 2016) (citing McBride v. Sch. Dist. of Greenville Cnty., 698 S.E.2d 845, 853 (S.C. Ct. App. 2010)); see also Davis v. New Penn Fin., LLC, 2021 WL 3410790, at *14 (D.S.C. May 25, 2021) (granting summary judgment in the defendant's favor after the plaintiff failed to "include actual statements" attributed to the alleged speaker and, instead, indicated that the speaker had said "disparaging things").  In Harris, the South Carolina Court of Appeals affirmed the trial court's decision granting summary judgment in the defendant's favor after the plaintiff was only able to assert that three memos had been circulated containing "malicious personal attacks . . . impugning [the plaintiff]'s professional standards and abilities."  Id. Here, Alexander similarly asserts that she was the subject of false statements questioning her professional competence.  Such general claims fail to provide the court with an opportunity to evaluate whether such statements were false or likely to lower Alexander's estimation in the community.

Alexander manages to point to one specific statement that Leonard allegedly made.  In her response to the motion for summary judgment, Alexander points to a conversation that Leonard admitted to having with Melody King ("King")—Alexander's coworker—following Alexander's termination.  Allegedly, Leonard said to King that Alexander "wasn't working within the scope of the pharmacy director [role]" and "wasn't able to work within the pharmacy director scope of what the job entails."  ECF No. 43 at

30 (citing Leonard Dep. 194:4–11).  According to Alexander, the statement was false because she "was absolutely working within the scope of the pharmacy director role."  Id.

Setting aside that the amended complaint does not allege that a defamatory statement was made to King, the more prominent issue is that a statement about whether an employee was working within the scope of her role is not a provably false statement. This requirement arises from United States Supreme Court jurisprudence on the First Amendment, and South Carolina courts have shaped the common law on defamation to subscribe to the same limitation.  See Erickson v. Jones Street Publishers, LLC, 629 S.E.2d 653, 665 (S.C. 2006) ("Concepts of common law defamation have been significantly modified since the 1960s by the First Amendment jurisprudence of the United States Supreme Court.").  While the Supreme Court has cautioned that courts must not recognize "a wholesale defamation exemption for anything that might be labeled 'opinion,'" an allegedly defamatory statement "must be provable as false before there can be liability under state defamation law."  Milkovich v. Lorain J. Co., 497 U.S. 1, 17–18 (1990).  Here, there is no ascertainable way for Leonard's opinion statement to be proven true or false, and as such, there can be no liability for defamation as to the only specific statement identified by Alexander.  See Davis, 2021 WL 3410790, at *18 (finding that statements made by a supervisor regarding the plaintiff's poor job performance were either true or "not based on ascertainable facts that could be shown to be true or false," even if the plaintiff "may think otherwise of her workplace performance").  In short, the statement is not provably false and thus not defamatory.

### b.  Unprivileged Publication to a Third Party

Alexander must establish each element to succeed on her defamation claim; therefore, her failure to raise a genuine dispute of material fact regarding the first element is enough to grant summary judgment in PharMerica's favor on this claim.  Additionally, PharMerica argues that Alexander has presented no evidence that any false or defamatory statements were ever published.  To demonstrate publication to a third party, a plaintiff must provide facts that include "the time, place, content and listener of the alleged defamatory matter."  Campbell v. Int'l Paper Co., 2013 WL 1874850, at *3 (D.S.C. May 3, 2013) (quoting English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc., 1999 WL 89125, at *3 (4th Cir. Feb. 23, 1999) (unpublished table opinion)); see also Davis, 2021 WL 3410790, at *16 (finding that the plaintiff had failed to provide sufficient detail regarding the allegedly defamatory statements, including what was said and when they were made, that would allow the court to evaluate them for defamatory content).

Here, Alexander has not presented any evidence, besides her own allegations, that Leonard made the general statements at issue to the individuals listed.  Alexander argues that she has presented evidence that the conversations with Toland, Franke at Seaside, Alex Jackson, Conway Manor, and Susan Griffith took place.  As the court observed at the hearing, however, the fact that conversations took place hardly evinces the fact that defamatory statements were made therein.  Conversely, PharMerica has presented evidence, in the form of Leonard's testimony, that she did not make any such statements about Alexander.  Although Alexander contends that certain portions of Leonard's deposition support her contentions, PharMerica argues that even those excerpts cited by Alexander undermine her argument.  For example, Leonard explained in her deposition

that she spoke to Toland about coming to Charleston to get Alexander "some help" but

that she otherwise did not talk to Toland much or did so in a group setting.  Leonard Dep.

86:21–87:12.[1]  She similarly denied speaking to Alex Jackson, Susan Griffith, or

individuals at Franke at Seaside and Conway Manor about Alexander except to "defend[]

Nikki [Alexander]."  Id. at 232:1–6, 234:22–25, 235:16–19, 235:24–236:23.  Alexander's

failure to rebut that evidence with evidence of her own proves fatal.[2]  "Once the movant

has made [a] threshold showing, the non-moving party, to survive the motion for

summary judgment, may not rest on the allegations averred in h[er] pleadings."  Watts v.

Harris, 2019 WL 7040603, at *3 (D.S.C. Oct. 22, 2019) (citing Celotex, 477 U.S. at 324).

In the absence of any evidence beyond Alexander's own averments, there is nothing

indicating that Leonard ever made the statements alleged—even if the court were to

credit them as actionable statements.  There are also no allegations or evidence specifying

when or where those statements, if made, occurred.  For those reasons, the court grants

summary judgment in PharMerica's favor on Alexander's defamation claim.

## C. Violation of the ADA

Finally, PharMerica argues that summary judgment is warranted in its favor on

Alexander's cause of action under the ADA.  Based on the amended complaint and the

parties' briefs, this cause of action consists of two claims.  Alexander alleges that

---

[1] In its motion to dismiss, PharMerica cites a deposition excerpt—where Leonard explained that she never felt the need to tell Toland or other pharmacy directors why Alexander was terminated—as evidence that Leonard did not defame her.  However, the amended complaint alleges that Leonard defamed Alexander in August 2019, meaning that testimony does not necessarily disprove that a defamatory statement was made.  Nevertheless, the remainder of the testimony cited by PharMerica is evidence that no such statements were made.

[2] Alexander did not depose any of the alleged recipients of the defamatory statements, further underscoring her lack of evidence beyond her own averments.

PharMerica (1) unlawfully discriminated against Alexander on the basis of her disability, and (2) failed to provide reasonable accommodations, both in violation of the ADA. Amend. Compl. ¶¶ 62, 64.  The court evaluates each claim in turn.

### 1. Discrimination

A plaintiff may avoid summary judgment on a disability discrimination claim through two avenues of proof: by presenting direct evidence of discrimination or by relying on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Jones v. Leavitt, 454 F. Supp. 2d 459, 463 (M.D.N.C. 2006) (citing Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55 (4th Cir. 1995)); see Hannah P. v. Coats, 916 F.3d 327, 342 (4th Cir. 2019); Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006); Marshall v. AT&T Mobility, 793 F. Supp. 2d 761, 763 (D.S.C. 2011).  Alexander does not argue that she has established her discrimination claim through direct evidence and instead argues that she has established a prima facie case of discrimination under the McDonnell Douglas burden-shifting framework.

Under that framework, Alexander must first establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  If she establishes a prima facie case, the burden shifts to PharMerica to provide a legitimate, nondiscriminatory reason for its conduct.  See Coats, 916 F.3d at 342.  If PharMerica provides such a reason, Alexander "bears the ultimate burden of persuasion" and "must show by a preponderance of the evidence that the proffered reason was a pretext for discrimination."  Id. (quoting Perry v. Comput. Scis. Corp., 429 F. App'x 218, 220 (4th Cir. 2011)).

Alexander's initial burden of establishing a prima facie case of discrimination entails showing that: (1) she was disabled; (2) she was otherwise qualified for the

position; and (3) she suffered an adverse employment action solely on the basis of her disability. Id. at 342 (citing Perry, 429 F. App'x at 219–20; Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005)). PharMerica does not dispute that Alexander's injury could result in a qualifying disability—it only reiterates that PharMerica was not aware of any disability. For purposes of establishing a prima facie case, the first element is satisfied.

However, Alexander's prima facie case fails under the second and third elements. Under the second element, PharMerica argues that Alexander was unqualified for the position based on the nature of her work both leading up to her injury and after the injury. Courts grant motions for summary judgment based on a failure to establish this element where the plaintiff failed to "fulfill[] h[er] employer's legitimate expectations at the time of h[er] discharge." Marshall v. AT&T Mobility, 793 F. Supp. 2d 761, 764 (D.S.C. 2011). Here, PharMerica has presented numerous records evincing Alexander's poor performance even prior to the accident. See ECF No. 42-6 at 2 (noting, inter alia, several recent issues that Alexander was responsible for, including failing to "compete[] the self master audit" and "[m]issing scheduled calls or [being] late to calls"); ECF No. 42-7 at 5 (providing an "Unacceptable" overall employee rating and noting that Alexander needed to improve on the Charleston location's "time delivery, on time launch, shorts, OPEX, labor and productivity – basically all areas of pharmacy metrics").

As for the third element, placement on a list for poor performance and termination are both generally considered materially adverse actions for purposes of retaliation claims. See Emani v. Bolden, 241 F. Supp. 3d 673, 684 (E.D. Va. 2017) (analyzing whether placement on a "PIP" list, which ultimately led to termination, would constitute

a materially adverse action).  But to fully establish the third element of her <u>prima</u> <u>facie</u> case, even with an adverse employment action, Alexander must also show that the adverse action was taken solely on the basis of her disability.  <u>See</u> <u>Coats</u>, 916 F.3d at 342.

Alexander has not produced any evidence showing that she was terminated solely on the basis of her disability.  Rather, Alexander's termination document contained multiple criticisms of her performance and conduct unrelated to any disability, including her "Unprofessional Behavior/lack of leadership," "Inability to complete Pharmacy Director tasks competently," "Lack of Communication/Miscommunication," and "Customer complaints."  ECF No. 42-15 at 3–4.  Within each of those headings, the termination document further specified several examples related to those shortcomings.  The examples included her failure to respond to Leonard, who was attempting to reach Alexander to address the emergency response to Hurricane Dorian.  It also included the incident where Alexander told pharmacy personnel that the bridges were shut down even though Leonard confirmed they were not.  Alexander does not argue that her disability caused these performance issues.  Indeed, in a letter to her secondary supervisor disputing her termination, Alexander failed to even mention her belief at the time that her termination might have been motivated by her disability.  <u>See</u> ECF No. 43-2 at 74.  This omission is even more glaring considering that Alexander went as far as to mention in the letter that Leonard had previously denied her bereavement leave following the hospitalization and death of Alexander's grandmother, which caused her "mental health and stress."  <u>Id.</u>  Presumably, if Alexander saw fit to mention that incident, she would have included her grievance about her workplace injury as well.  Based on all the

evidence, the court finds that Alexander's termination was not based solely on her disability as a matter of law.

Even if the court were to assume for purposes of summary judgment that Alexander presented sufficient evidence to establish a prima facie case, the evidence establishes a legitimate, non-discriminatory reason for PharMerica's decision to terminate Alexander's employment. Alexander argues that such reasons were merely pretextual, as evidenced by the fact that Alexander received accolades for demonstrating certain areas of improvement and "did not receive a single disciplinary action from December 1, 2018 – September 6, 2019." ECF No. 43 at 27. Alexander fails to rebut the records cited by PharMerica, including the performance review dated February 20, 2019, in which Alexander was given an "Unacceptable" employee rating. ECF No. 42-7 at 5. Alexander also argues that the court may look to the temporal proximity between when Alexander developed the disability and when she was fired. But that argument completely fails to account for the reasons provided in the termination document, which must be considered in light of PharMerica's expectations for Alexander during Hurricane Dorian. Thus, based on the record, there is no genuine dispute of material fact that PharMerica provided sufficient nondiscriminatory reasons for Alexander's termination. Alexander has not shown that her termination was a result of her disability. Accordingly, PharMerica is entitled to summary judgment on Alexander's ADA discrimination claim.

### 2. Reasonable Accommodations

Finally, the court turns to Alexander's claim that PharMerica failed to provide reasonable accommodations for her disability. Establishing a prima facie case for failure to accommodate under the ADA requires a plaintiff to show "(1) that she was an

individual who had a disability within the meaning of the statute; (2) the employer had notice of her disability; (3) she could perform the essential functions of her position with reasonable accommodations; and (4) the employer refused to make such accommodations."  Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013).  "Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation."  Haneke v. Mid-Atl. Capital Mgmt., 131 F. App'x 399, 400 (4th Cir. 2005).  In determining whether an employer and an employee engage in such a process in good faith, "[n]o hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."  Id. (quoting Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135–36 (7th Cir. 1996)).  Instead, the Fourth Circuit has explained that "courts should look for signs of failure to participate in good faith" such as "[a] party that obstructs or delays the interactive process" or "[a] party that fails to communicate, by way of initiation or response."  Id. (quoting Beck, 75 F.3d at 1135–36).  Importantly, "an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process," but "[r]ather, the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee."  Id. at 323.

PharMerica focuses almost entirely on the second element and argues, once again, that it had no notice of Alexander's supposed disability prior to her termination, and, therefore, it could not have known to engage in an interactive process to identify a reasonable accommodation.  As a preliminary matter, the court notes that what

constitutes "notice" slightly differs between the ADA context and the South Carolina workers' compensation claim context. Again, a workers' compensation retaliation claim requires something akin to the employer's payment of medical bills or the employee's provision of a note describing treatment. Under the ADA, "[t]he duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to h[er] employer h[er] disability and h[er] desire for an accommodation for that disability." Wilson, 717 F.3d at 346–47. Thus, "[w]hat matters under the ADA [is] . . . whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and the desire for an accommodation." Id. (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)).

The court does not find that the differing articulations for notice compel a different result. The court remains unconvinced that an email where Alexander wrote "I didn't fall but I think I may have strained my back" and an alleged conversation about Alexander's remote consultation with a physician reasonably communicate the existence of a disability. Even if the court were to find that such notice was sufficient, Alexander would still have to pass the second hurdle of proving that she communicated her "desire for an accommodation of that disability." Wilson, 717 F.3d at 346–47. On this point, Alexander claims that she rented a larger car after her injury "due to the extreme pain that her personal vehicle was causing her." ECF No. 43 at 14. According to Alexander, the "rental vehicle would have been included in Plaintiff's expense report, which are [sic] approved by Leonard, which [] would have placed Leonard on notice" of the desire for an accommodation. Id. Leonard emphatically stated that she was never told that Alexander

obtained a rental vehicle due to the pain from her injury, Leonard Dep. at 98:4–8, and unlike the dispute regarding whether Alexander mentioned her telephone call with a physician, Alexander does not claim that such a conversation took place regarding the rental car.  The court finds that no reasonable juror would find that a single expense report item—even if Leonard had seen it—could have provided PharMerica with notice regarding Alexander's desire for an accommodation.  Therefore, the court grants summary judgment as to Alexander's reasonable accommodations claim because Alexander cannot reasonably dispute that PharMerica was not on notice of Alexander's disability for purposes of knowing to engage in the interactive process of identifying appropriate accommodations.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** the motion for summary judgment in its entirety.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 5, 2022**
**Charleston, South Carolina**